UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

SEVEN CORNERS SHOPPING CENTER
FALLS CHURCH, VA. LIMITED
PARTNERSHIP,

               Plaintiff,

       v.

CHESAPEAKE ENTERPRISES USA LLC d/b/a
QUIZNOS, RNS, INC., CHINTA MANI
LAMICHHANE, LALITA LAMICHHANE,
KALPALA ARYAL, GAJENDRA ARYAL,
SANJAYA THAPA, BADRI LAMICHHANE,
RANJANA PANDEY, KEDAR NATH PANDEY
and NAAMAN SHABAN,

               Defendants.
_____

REPORT & RECOMMENDATION

07-CV-6332T

## PRELIMINARY STATEMENT

On March 13, 2009, United States District Judge Michael A. Telesca granted summary judgment to plaintiff Seven Corners Shopping Center Falls Church, Va. Limited Partnership ("Seven Corners") against defendants Chesapeake Enterprises USA LLC d/b/a Quiznos, Chinta Mani Lamichhane, Lalita Lamichhane, Kalpala Aryal, Gajendra Aryal, Sanjaya Thapa, Badri Lamichhane, Ranjana Pandey and Kedar Nath Pandey (collectively, "the Chesapeake defendants") on its claims for breach of contract in connection with a commercial lease executed by the parties on May 17, 2004.[1] (Docket # 48 at 18). After determining liability, Judge Telesca found that issues of fact remained regarding the amount of Seven Corners'

---

[1] On February 12, 2009, a default judgment was entered in favor of plaintiffs against defendants RNS, Inc. and Naaman Shaban (collectively, the "RNS defendants"). (Docket ## 26, 27).

damages and referred the matter to me to conduct a hearing on damages. (*Id*. at 21). Judge Telesca has specifically directed this Court: (1) to determine whether Seven Corners has credited the Chesapeake defendants for all rents it received from RNS, the successor tenant to which the Chesapeake defendants assigned the lease in 2006; (2) to determine whether the Chesapeake defendants have been credited for all rents that the tenant subsequent to RNS, a beauty supply store, had agreed to pay; and (3) to adjust Seven Corners' accounting of damages accordingly. (Docket # 61 at 3).

The hearing was conducted on July 23, 2009. (Docket # 65).[2] For the reasons discussed below, it is my recommendation that Seven Corners be awarded $176,677.80 in damages.

## PROCEDURAL HISTORY

This action was initially filed in state court and was removed to federal court on July 3, 2007. (Docket # 1). The procedural history and factual background of this case have been set forth in two prior decisions by Judge Telesca and will not be repeated here except as necessary to resolve the factual issues pending before this Court. (Docket ## 28, 48).[3] Familiarity with those prior decisions is assumed.

Seven Corners filed a motion for summary judgment against the Chesapeake defendants on December 7, 2007, before the parties had engaged in any discovery. (Docket

---

[2] A transcript of the hearing conducted before this Court on July 23, 2009, shall be referred to herein as "Tr." (Docket # 67).

[3] *See Seven Corners Shopping Ctr. Falls Church, Va. Ltd. P'ship v. Chesapeake Enterprises USA LLC*, 2009 WL 700868 (W.D.N.Y. 2009); *Seven Corners Shopping Ctr. Falls Church, Va. Ltd. P'ship v. Chesapeake Enterprises USA LLC*, 2008 WL 1766617 (W.D.N.Y. 2008).

2

# 13). The Chesapeake defendants opposed the motion and moved for discovery under Rule 56(f) of the Federal Rules of Civil Procedure. (Docket # 20). On April 14, 2008, Judge Telesca denied the motion without prejudice to renewal on the grounds that factual disputes existed that precluded the entry of summary judgment. (Docket # 28 at 7). Specifically, the Chesapeake defendants "dispute[d] that rent payments were not paid from October 2006 forward; that the premises were vacated in January 2007; the amount of late fees claimed by the plaintiff is owed; and total amount of damages claimed by the plaintiff." (*Id*. at 6). Recognizing those disputed issues of fact, Judge Telesca permitted the parties ninety days to conduct limited discovery on the issues of "(1) whether rent was paid on the [p]remises by the [RNS] defendants from October 2006 through January 2007; and (2) whether the [p]remises were vacated in January 2007 by [RNS] defendants." (*Id*. at 7-8).

Despite this order, the Chesapeake defendants apparently failed to conduct any discovery within the time frame set by the Court. (Docket # 48 at 21). When the deadline expired, Seven Corners renewed its motion for summary judgment, which Judge Telesca granted on March 13, 2009. (Docket ## 33, 48). He determined that the Chesapeake defendants remained liable for the rent unpaid by the RNS defendants at the time that RNS vacated the premises in January 2007. (Docket # 48 at 12). In addition, he found that the acceleration clause in the lease, which required the Chesapeake defendants to pay immediately the difference for the entire lease term between the rent that it agreed to pay and the rent that the new tenant agreed to pay, was a valid and enforceable liquidated damages clause. (Docket # 48 at 12, 18). Judge Telesca further found that the Chesapeake defendants had raised issues of fact regarding the amount of Seven Corners' damages, namely, the amount of rent that was unpaid by RNS and the

amount of rent that the beauty supply store was responsible for under its lease with plaintiff. The matter was referred to me to conduct a hearing on damages and issue a report and recommendation to the district judge. (*Id*. at 21-22).

Following that decision, a dispute arose between the parties as to whether the district court's order permitted pre-hearing discovery. Among the issues that the Chesapeake defendants sought to explore in discovery was the question of the commercial reasonableness of Seven Corners' efforts to re-let the premises. (Docket # 51-6). Unable to reach a resolution with the plaintiff, the Chesapeake defendants sought clarification from Judge Telesca of his decision. (Docket # 51).

On July 22, 2009, Judge Telesca ruled that no pre-hearing discovery would be permitted and that the Chesapeake defendants had waived any challenge to the commercial reasonableness of Seven Corners' decision to re-let the premises to the beauty supply store.[4] (Docket # 61 at 3). He identified "the only issue remaining [as] the amount of damages plaintiff is entitled to pursuant to the lease." (*Id*.). As framed by Judge Telesca, the issues to be resolved through the hearing are (1) whether the plaintiff has credited the Chesapeake defendants for all rents it collected from the RNS defendants; (2) whether the Chesapeake defendants have been credited for "all present and future rent that the new tenant [the beauty supply store] had agreed to pay;" and (3) whether Seven Corners' accounting needs to be adjusted in accordance with those determinations. (*Id.* at 4).

---

[4] Judge Telesca noted that "at no time in any of its briefs did the Chesapeake defendants raise the issue of commercial reasonableness." (Docket # 61 at 3).

As directed, I held an evidentiary hearing on July 23, 2009. Nicholas Vassello ("Vassello") testified for Seven Corners. Defendants Gajendra Aryal ("Aryal") and Badri Lamichhane ("Lamichhane") testified for the Chesapeake defendants.

**FINDINGS OF FACT**

The credible hearing testimony and exhibits establishes the following facts.

I. **The Original Lease Between Seven Corners and the Chesapeake Defendants**

On May 17, 2004, Seven Corners entered into a lease agreement with the Chesapeake defendants, pursuant to which Seven Corners agreed to lease space to the Chesapeake defendants for the purposes of opening a Quiznos restaurant in a shopping center in Falls Church, Virginia. (Exhibit ("Ex.") A ("Lease")).[5] According to its terms, the lease commenced on May 1, 2004 or the date on which Seven Corners delivered the premises to the Chesapeake defendants, whichever occurred later, and was to run for a period of 123 months from the commencement date. (Lease § 1.03; Tr. 56, 63). Under the lease, rent was to be paid in monthly installments of $5,598 beginning on the first day of the fourth month after the commencement date, thus making the first three months rent-free. (Lease § 2.01; Tr. 65). The lease further provided for annual increases in rent payments of three percent. (Lease § 29.01).

In addition to the monthly rent payments, the lease obligated the Chesapeake defendants to pay several other recurring and non-recurring charges. For example, the lease required the defendants to remit a "triple payment" to cover real property taxes (Lease § 5.01),

---

[5] The parties stipulated at the hearing to the admission of the Complaint, to which the lease is appended, and the Answer, marked respectively as Exhibits A and B. (Tr. 27).

5

common area maintenance (Lease § 11.01) and fire insurance premiums (Lease § 14.01), even during the first three "rent-free" months. (Tr. at 65). The monthly property tax charge was budgeted by Seven Corners at the beginning of each calendar year based on its estimate of the total tax liability for the shopping center divided proportionally between the tenants based on the relative square footage of each tenant's leased property. (Lease § 5.01; Tr. 38). At various times during the year, including at year-end, Seven Corners would reconcile the tenant's payment with the actual tax assessed and either refund any overpayments or charge for any underpayments. (Tr. 39-40, 68-69; Lease § 5.01). The common area maintenance charge was likewise estimated at the beginning of the year according to the square footage of each tenant's leased space and then reconciled with the actual expenses several times a year. (Tr. 38, 68-69; Lease § 11.02). The lease also provided that the Chesapeake defendants pay a $6,000 security deposit, which the parties agree they paid. (Lease § 9.01; Tr. 54). Finally, the lease obligated the defendants to pay a monthly fee of $839.70 in the event of a late payment. (Lease § 2.05).

The lease also included a "rent acceleration" clause, which Judge Telesca has determined to be valid and enforceable. That clause provided:

> In the event that Tenant vacates or abandons the leased premises during the term of this Lease, or fails to take possession and operate its business as stated in this SECTION, the whole sum to be paid as rental and additional rental throughout the entire term of this Lease including the fixed minimum rental herein provided for, shall immediately become due and payable unless prohibited by law. Owner, at its option, may re-enter the leased premises and relet the same and it is expressly agreed that Tenant shall not be entitled to credit for the rents so received until the sum due from Tenant to Owner, including damages, expenses, attorney's fees, cost of alterations and repairs as herein provided shall have been fully paid, and nothing in this paragraph shall be deemed to have waived any other right or remedy of Owner.

(Lease § 7.01).

6

## II. Assignment of the Chesapeake Defendants' Lease to the RNS Defendants

On June 5, 2006, the Chesapeake defendants relinquished possession of the premises to the RNS defendants and executed an agreement with them to assign and amend their lease with Seven Corners effective May 1, 2006. (Docket # 48 at 3; Ex. A ("Assignment")). The assignment agreement, to which Seven Corners consented, provided for monthly rent payments of $5,765.94 for the first year of the lease with annual increases of three percent during the term of the lease (May 1, 2006 through March 31, 2015). (Assignment at 1). The assignment agreement also provided that the Chesapeake and RNS defendants would be jointly and severally liable for all rental payments and other charges under the lease. (Assignment at 2).

## III. Breach by RNS and the Re-Letting of the Premises to the Beauty Supply Store

Following late rental payments in July and August 2006, the RNS defendants ceased paying any rent beginning in October 2006 and vacated the premises in late December 2006 or January 2007. (Docket # 48 at 19; Tr. 26; Ex. C). In February 2007, Seven Corners entered into a new lease with a beauty supply store for a term beginning on March 1, 2007 and ending on August 31, 2017. (Ex. D at § 2.01; Tr. 46-47). The lease charged the new tenant less rent than the original lease had charged the Chesapeake defendants. (*Id.*). Specifically, the new tenant was obligated to make monthly payments of $4,665 during the first two years of the lease (March 1, 2007 through February 28, 2009), with specific annual increases thereafter. (*Id.*). In addition, as an incentive to sign the lease, Seven Corners agreed to forego rent collection during the first six months of the lease. (*Id.*; Tr. 47).

## IV. Seven Corners' Damages

Seven Corners' Director of Collections during the relevant time period, Nicholas Vassello, testified at the hearing to explain Seven Corners' calculation of damages. As he testified, his duties in that position included overseeing the payment of all tenant charges and the collection of any delinquent sums. (Tr. 24-25). He explained that the company, and his department in particular, used a computer system to facilitate the monitoring of tenants' accounts. (Tr. 26). This program, known by the acronym "MRI," enabled Vassello to determine the status of any tenant's account at any particular point in time. (Tr. 25). For each tenant's lease, a member of Vassello's department was responsible for inputting into the MRI system all of the charges and expenses due under the lease – such as rent, escrow payments, applicable late fees – at the time the lease was executed. (Tr. 30-32). During the term of the lease, an employee was responsible for inputting into the system each payment received under the lease. (Tr. 43). If a tenant failed to make a rental payment, for example, the missed payment automatically posted to the account, along with any applicable late fee. (Tr. 26, 31-33, 36, 43). Periodic reconciliations of the tax, maintenance and insurance fees were also made to the account through manual entries performed by the accounting department. (Tr. 39-41, 76).

Using the MRI system, Vassello was able to generate a printed accounting of the status of the charges that had been posted to the Chesapeake defendants' account as of February 28, 2007, the day before the new lease commenced with the beauty supply store. (Tr. 28, 46; Ex. C). Based on that accounting, Vassello testified that as of February 28, 2007 the Chesapeake

defendants' account was in arrears in the amount of $38,815.15. (Tr. 46).[6] The sum consisted of the following unpaid charges during RNS's lease term: (1) $28,829.70 in unpaid rent (monthly rent of $5,765.94 for the months of October, November, December of 2006, January and February of 2007); (2) $2,993.69 in common area maintenance charges (for the same months); (3) $1,606.63 in taxes (for the same months); (4) $144.03 in insurance charges (for the same months); (5) $5,038.20 in late charges (monthly fees of $839.70 for the months of July, August, October, November, December of 2006 and January 2007).[7] (Ex. C). In addition to these charges, the accounting reflects several charges and credits reconciling the budgeted escrow

---

[6] Much of the Chesapeake defendants' post-hearing brief is devoted to the contention that Exhibit C was not properly admitted as a business record under Rule 803(6) of the Federal Rules of Evidence. (Docket # 68 at 15-22); *see* Fed. R. Evid. 803(6). I entertained extensive argument over the admissibility of that exhibit during the hearing. I required Seven Corners to elicit additional foundational testimony and permitted the Chesapeake defendants to conduct *voir dire* regarding the document. (Tr. 29-42). I also questioned Vassello about the document. (Tr. 43-45). Following those inquiries, I determined that an adequate foundation had been established for its admissibility as a "record of regularly conducted activity" under Rule 803(6). (Tr. 45).

Vassello's testimony established that the entries that were made into the computer program were made by an employee whose duties included the entry of such data and that such entries were made contemporaneously upon the execution of the lease and the receipt or non-receipt of a required lease payment. (Tr. 30-35, 43). His testimony further established that the data was regularly relied upon by him to monitor the status of tenants' accounts and that Exhibit C was prepared and maintained in the ordinary course of business. (Tr. 28, 30, 33-35, 45). *AT&T Corp. v. Cmty. Network Servs., Inc.*, 1999 WL 1267457, *5 (S.D.N.Y. 1999) ("AT&T employees[] regularly retrieve data from AT&T's computer system that contains customer account information and rely upon those records to determine subscription, usage, and payment by customers. . . . Under the circumstances, the [printed-out accounting] bear[s] sufficient indicia of trustworthiness for consideration [as a business record]"). That Exhibit C was not printed out until some time after the entries were made – specifically, the day before the commencement of Seven Corners' lease with the beauty supply store – does not render it inadmissible under Rule 803(6). *See, e.g., Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627, 632 (2d Cir. 1994) ("[a] business record may include data stored electronically on computers and later printed out for presentation in court, so long as the original computer data compilation was prepared pursuant to a business duty in accordance with regular business practice") (internal quotation omitted); *Health Alliance Network, Inc. v. Cont'l Cas. Co.*, 245 F.R.D. 121, 129 (S.D.N.Y. 2007) (rejecting argument that lists compiled from data stored electronically through the use of a query was inadmissible as business record, noting that argument "ignores the realities of modern business litigation, where many business records are kept in databases, and parties query these databases in order to provide responses to discovery requests"), *aff'd*, 294 F. App'x 680 (2d Cir. 2008). Accordingly, I adhere to my ruling at the hearing that Exhibit C is properly admissible under the business records exception. *See AT&T Corp. v. Cmty Network Servs., Inc.*, 1999 WL 1267457 at *4-5 (determining that compilation of data entered into and stored on computer system to show payment history was admissible under Rule 803(6)).

[7] No explanation was offered as to why a late fee was not charged in February 2007.

9

payments with the expenses actually assessed. Those reconciliations were posted on September 1, 2006, November 1, 2006 and February 13, 2007 and resulted in a net credit to the account of $316.07. (Ex. C; Tr. 74). The accounting also reflects year-end reconciliation charges for the maintenance and insurance charges for 2006 in the amounts of $445.80 and $66.94, respectively. (*Id.*). The final item in the accounting is a charge of $6.23 described as "[b]ill legal fees," which Vassello could not specifically explain. (Tr. 73-74).

Vassello further testified that based on the rent acceleration clause, the Chesapeake defendants owe an additional $143,492.08. (Tr. 53). Vassello calculated this amount by subtracting from the amount of aggregate rent that the defendants agreed to but did not pay under the terms of the assignment agreement the aggregate rent owed by the tenant to which Seven Corners re-let the premises (the beauty supply store). (Tr. 50-53). To that amount, Vassello added the past due balance of $38,815.15 and a charge of $415.80 for "sign removal"[8] and credited the $6,000 security deposit and a $39 tax refund from 2006, thus resulting in a total amount due of $176,684.03. (Tr. 54-55).

## V. **Defendants' Claims for Credit**

Defendants contend that Vassello's computation of damages should be reduced to reflect credits to which they are entitled. First, they maintain that they are entitled to an offset for certain fixtures that they paid to have installed on the premises. (Docket # 56 at 7-8). As I determined at the hearing, the Chesapeake defendants' failure to plead offset as an affirmative

---

[8] Vassello testified that $415.80 was the cost incurred by Seven Corners to remove the defendants' storefront sign that they abandoned. (Tr. 55).

10

defense or otherwise constitutes a waiver of such a claim. (*See* Ex. B; Tr. 18). *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 42 (2d Cir. 2009) ("irrespective of whether a setoff claim is properly characterized as an affirmative defense, *see* Fed. R. Civ. P. 8(c), or a compulsory or permissive counterclaim, *see* Fed. R. Civ. P. 13, it must be set forth in the pleadings to provide a basis for relief"; failure to do so results in waiver of claim) (citing *Valley Disposal Inc. v. Cent. Vt. Solid Waste Mgmt. Dist.*, 113 F.3d 357, 364 (2d Cir. 1997)).

Second, the Chesapeake defendants urge that they are entitled to a credit for an unspecified number of rental payments that they made at the inception of the lease on the grounds that the premises was not in fact delivered to them on December 15, 2004, because it was not in "vanilla shell" condition on that date and was smaller than the 1,866 square feet described in the lease. (Docket # 68 at 23; Tr. 21-23, 56). Specifically, defendant Aryal testified that the Chesapeake defendants had to make and pay for many of the renovations included in the description of the "vanilla shell" condition, such as the installation of a drop ceiling, two bathrooms, electrical wiring and a heating and air conditioning system, which were not completed until the restaurant opened in May 2005. (Tr. 80-82; Docket # 68 at 10). Aryal also testified that he believed the size of the premises was "1,700 [square feet] or something," instead of the 1,866 square feet described in the lease. (Tr. 82-83; Docket # 68 at 11).

At the hearing, I permitted testimony on these issues, while reserving on Seven Corners' objection to the testimony. Having further considered the issues and the parties' post-hearing memoranda, I conclude that the Chesapeake defendants have waived these claims for offsets by not pleading them in their answer. *See Arch Ins. Co. v. Precision Stone, Inc.*, 584

11

F.3d at 42. The claims are, in any event, beyond the scope of the issues framed by Judge Telesca and referred to me for report and recommendation.

## TOTAL DAMAGES

### I. Damages Resulting from the RNS Defendants' Default

With respect to the RNS defendants' default under the assigned lease, Judge Telesca directed this Court to determine whether Seven Corners had credited the Chesapeake defendants for all of the rent that RNS paid. I conclude that it did.

The credible evidence demonstrates that the RNS defendants ceased to make monthly rental and associated escrow payments beginning in October 2006. In addition to defaulting on those obligations, the RNS defendants also failed to pay several late fees as detailed in Vassello's accounting summary, Exhibit C. Adjusting those charges to reflect the mid- and year-end reconciliations of the escrow accounts, the total sum that the Chesapeake defendants owe Seven Corners as a result of the RNS defendants' default is $38,808.92.[9]

### II. Damages Under the Accelerated Rent Clause

With respect to Seven Corners' lease with the beauty supply store, Judge Telesca directed this Court to determine whether Seven Corners had credited the Chesapeake defendants for all rents that the beauty supply store agreed to pay under its lease. I conclude that it did.

---

[9] I find that Vassello's testimony does not adequately support the $6.23 charge for legal fees posted to the account in November 2006, and I recommend excluding that expense from the sum.

The beauty supply store's lease with Seven Corners commenced on March 1, 2007. Although the Chesapeake defendants maintain that the tenant actually took possession earlier than March 1, 2007 (Docket # 68 at 13), the terms of the lease specify March 1, 2007 as the commencement date of the lease. (Ex. D at § 1.03; Tr. 71-72). In other words, unlike the Chesapeake defendants' lease, the commencement date did not turn on the date of delivery of the premises. (Tr. 71-72). As Vassello testified, during the period between the RNS defendants' default and the lease termination date of March 31, 2015, the difference between the amount of rent that the beauty supply store is obligated to pay under its lease and the amount that the Chesapeake defendants were obligated to pay under the assignment agreement is $143,492.08. That calculation is correct and consistent with the terms of the applicable lease agreements.

### III. Other Adjustments

Finally, Judge Telesca directed this Court to make appropriate adjustments to Seven Corners' accounting of damages. As outlined above, I recommend that its calculation of damages in the amount of $176,684.03 be reduced by the $6.23 charge for legal fees that Vassello was unable to explain in his testimony. In all other respects, I find that Seven Corners' accounting of its damages is accurate and fully supported by the evidence adduced at the hearing.

## CONCLUSION

For the foregoing reasons, it is my recommendation to the district court to award damages in favor of Seven Corners against the Chesapeake defendants in the amount of $176,677.80.

                                                 *s/Marian W. Payson*
                                                      MARIAN W. PAYSON
                                                 United States Magistrate Judge

Dated: Rochester, New York
         August   6  , 2010

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b), 6(a) and 6(e) and Local Rule 72.3(a)(3).

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See e.g. Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**IT IS SO ORDERED.**

                                          *s/Marian W. Payson*
                                          MARIAN W. PAYSON
                                          United States Magistrate Judge

Dated: Rochester, New York
        August __6__, 2010